**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **NASSER AL-SHAKLIAH,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **MARCO RUBIO, Secretary of State,** <br><br> **Defendant.** | **Civil Action No. 25-3870 (JEB)** |

**MEMORANDUM OPINION**

Plaintiffs are two unrelated families — nationals of Yemen and Sudan — who sought visas to come to the United States to reunite with loved ones and to pursue opportunity. Each navigated through the ordinary process abroad: they submitted applications, appeared for consular interviews, and, after periods of administrative processing, were informed that their visas had been approved. That success, however, was fleeting. Last June, the President issued Proclamation 10,949 to restrict the entry of nationals from twelve countries, including Yemen and Sudan. With that barrier in place, consular officers canceled Plaintiffs' visas and refused their underlying applications.

Believing State's action to be unlawful, Plaintiffs filed an eight-count action under the Administrative Procedure Act and the Mandamus Act. Their claims have two dimensions. At one level, they challenge what happened to them — the cancellation of their approved visas and the subsequent refusals. At another, they mount broader attacks on what they describe as State Department practices: a "No-Visa Policy," under which the Government allegedly treats entry

1

restrictions as a bar to visa issuance, and a "No-NIE Policy," under which national-interest exceptions to the entry restrictions are purportedly unavailable in practice.

Defendant moves to dismiss on several grounds, contending primarily that consular nonreviewability forecloses most of Plaintiffs' claims. While the Court agrees that the doctrine does substantial work here, it does not dispose of the case in full. The Motion will therefore be granted in part and denied in part.

## I.    Background

The Court begins with the statutory and regulatory framework governing visa issuance and admission. It then turns to the Proclamation, Plaintiffs' visa applications, and the procedural history of this case.

### A.    Statutory and Regulatory Framework

Under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, a noncitizen seeking to enter the United States must generally satisfy two requirements. First, before traveling, the individual must obtain authorization to seek entry — most commonly, a visa issued by a consular officer at a United States embassy or consulate. Id., §§ 1201(a)(1), 1202. Second, upon arrival, a Department of Homeland Security officer determines whether the noncitizen is admissible to the United States. Id., §§ 1182(a), 1225(a)(3). The two conditions are related yet distinct. A visa "has never guaranteed an alien's entry into the United States" but instead "merely gives the alien permission to arrive at a port of entry" for an admission determination. Saavedra Bruno v. Albright, 197 F.3d 1153, 1157 (D.C. Cir. 1999). Ineligibility for admission, moreover, does not necessarily establish ineligibility for a visa. See, e.g., 8 U.S.C. § 1182(k) (permitting Attorney General to admit "otherwise inadmissible aliens who possess immigrant visas"). The INA "is rife with examples distinguishing between the two concepts." Trump v.

Hawaii, 585 U.S. 667, 694 n.3 (2018).  Indeed, while the INA treats entry and admission as interchangeable, it does not include visas in their company.  Id. at 695 n.4 ("The concepts of entry and admission — but not issuance of a visa — are used interchangeably in the INA.").

The visa side of the two-checkpoint system is governed by a detailed statutory and regulatory scheme.  Congress has directed that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer," 8 U.S.C. § 1202(b), with parallel authority for nonimmigrant applications.  Id., § 1202(d).  When said applications are "properly completed and executed before a consular officer," that officer "must issue the visa" or "refuse the visa under INA 212(a) or 221(g) or other applicable law."  22 C.F.R. § 42.81(a).  The grounds on which a visa may be refused are enumerated in 8 U.S.C. § 1201(g): "[I]f . . . the consular officer knows or has reason to believe that such alien is ineligible to receive a visa . . . under section 1182 of this title, or any other provision of law . . . ."

Although § 1201(g) directs consular officers to § 1182, that provision does not deal in visa eligibility alone.  Section 1182 contains both visa-eligibility and entry-eligibility provisions, with the two overlapping at times and diverging at others.  Almaqrami v. Pompeo, 933 F.3d 774, 776 (D.C. Cir. 2019) (noting distinction).  Subsection (a), for instance, provides that "aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States."  8 U.S.C. § 1182(a) (emphasis added).  Those who "have a communicable disease," "ha[ve] engaged in a terrorist activity," or are "likely at any time to become a public charge" may accordingly be denied both entry and a visa.  See generally id., § 1182(a)(1)–(10).  Subsection (d), meanwhile, focuses solely on visa issuance: "The Secretary of State may . . . decline to issue a visa to an alien who abused a position of power to expropriate American property."  Almaqrami, 933 F.3d at 776 (citing 8 U.S.C. § 1182(d)).  Subsection (f)

3

sits on the entry side of the divide.  It authorizes the President to "suspend the entry" of a class of aliens or impose restrictions if such entry "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).

B.    Immigrant and Nonimmigrant Visas

The INA distinguishes between two broad categories of visas.  An immigrant visa confers lawful-permanent-resident status.  Id., § 1101(a)(16), (20).  A nonimmigrant visa authorizes temporary presence in the country for a defined purpose and period.  Id., § 1101(a)(15), (26).  Each category is subdivided into classifications, two of which are relevant here: the employment-based second preference, or "EB-2," in the immigrant-visa category, id., § 1153(b)(2), and the "J" exchange-visitor classification in the nonimmigrant-visa category.  Id., § 1101(a)(15)(J).

The EB-2 category is available to noncitizens with advanced degrees and ordinarily requires a job offer from a U.S. employer plus a Department of Labor certification.  Id., §§ 1153(b)(2)(A), 1182(a)(5)(A).  Congress authorized waiver of the latter two requirements when doing so is deemed to "be in the national interest."  Id., § 1153(b)(2)(B)(i); 8 C.F.R. § 204.5(k)(4)(ii).  The United States Citizenship and Immigration Services (USCIS) adjudicates the national-interest waiver (NIW), and an approved petition with NIW classification establishes employment-based eligibility for an immigrant visa.  See 8 U.S.C. § 1154(b); 8 C.F.R. § 204.5(a), (k), (n).  Visa issuance, however, requires a separate step: consular processing of an immigrant-visa application abroad, culminating in adjudication by a consular officer.  See 22 C.F.R. §§ 42.61–63, 42.81(a).

The J classification is a nonimmigrant category for noncitizens entering the United States temporarily for educational, research, or training purposes in connection with a program designated by the Secretary of State.  See 8 U.S.C. § 1101(a)(15)(J).  To qualify for a J-1 visa, an

4

applicant must have been accepted into a designated exchange-visitor program — as evidenced by Form DS-2019, the Certificate of Eligibility for Exchange Visitor Status, issued by a program sponsor — and meet other requirements.  See 22 C.F.R. § 41.62(a)(1)–(5).  With a DS-2019 in hand, the applicant submits a visa application for adjudication by a consular officer.  Id., §§ 41.101–103, 41.121(a).

        C.          Presidential Proclamation

On January 20, 2025, the President issued Executive Order 14,161 directing the Secretary of State to identify countries whose "vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries" under 8 U.S.C. § 1182(f).  See 90 Fed. Reg. 8,451, 8,451 (Jan. 30, 2025).  Following receipt of the required report, the President issued Proclamation 10,949 on June 4, 2025.  See 90 Fed. Reg. 24,497 (June 10, 2025).  Invoking § 1182(f), the Proclamation "fully restrict[ed] and limit[ed] the entry of nationals" from twelve countries, including Yemen and Sudan.  Id. at 24,499–501. A subsequent Proclamation continued those restrictions.  See Proclamation No. 10,998, 90 Fed. Reg. 59,717 (Dec. 19, 2025).

The Proclamation's restriction on entry from the affected countries is broad but bounded. Several categories of noncitizens are excepted outright — lawful permanent residents, certain diplomatic and international-organization visa holders, and adoptees among them.  See 90 Fed. Reg. at 24,502–03.  Beyond those categorical exceptions, Section 4(d) provides for a case-by-case national-interest exception (NIE) "for individuals for whom the Secretary of State finds, in his discretion, . . . would serve a United States national interest."  Id. at 24,503.  That exception is distinct from the NIW USCIS grants in the EB-2 visa context.  See 8 U.S.C. § 1153(b)(2)(B)(i).  The Proclamation makes clear, furthermore, that this discretionary exception

"is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity."  90 Fed. Reg. at 24,504.

        D.        <u>Plaintiffs' Visa Applications</u>

The Al-Shakliah family — Nasser Al-Shakliah, his wife Arzaq Saleh, and their four minor children — are Yemeni nationals.  Al-Shakliah self-petitioned for an immigrant visa in the EB-2 category in April 2023, seeking to come to the United States to work as a research chemist whose proposed endeavors USCIS found to be in the national interest.  See ECF No. 1 (Compl.), ¶¶ 28, 93–95.  USCIS approved his I-140 petition with NIW classification in June 2023 and waived the labor-certification requirement.  Id., ¶¶ 94–95.  Al-Shakliah then applied for the immigrant visa through consular processing, with his wife and children as derivative beneficiaries.  Id., ¶¶ 4, 96, 98.  After nearly two years of pre-interview delay, the family attended their consular interview at the U.S. Embassy in Djibouti in April 2025.  Id., ¶ 99.  On May 10, 2025, the Embassy notified Al-Shakliah that processing was complete and requested the family's passports for visa printing.  Id., ¶¶ 100–01.  On June 8, the Embassy emailed that the visas were ready for collection.  Id., ¶ 102.

The very next day — the effective date of Proclamation 10,949 — Al-Shakliah returned to the Embassy to collect the passports but was not admitted.  Id., ¶ 104.  When he returned two days later, the family's status had been changed from "issued" to "refused."  Id., ¶ 105.  On July 2, the Embassy emailed Al-Shakliah that he had been "found . . . ineligible for an immigrant visa under Section 212(f)" pursuant to the Proclamation and that "[t]aking into account the provisions of the Proclamation, a National Interest Exception (NIE) [would] not be granted."  Id., ¶ 107.  When the passports were eventually returned, the visa foils had been stamped "cancelled without prejudice."  Id., ¶ 108.

Plaintiffs Khalid Saad and Razan Elhussein are Sudanese nationals.  Saad had been matched to the Internal Medicine residency program at Corewell Health Hospital in Michigan and applied for a J-1 exchange-visitor visa based on that placement.  Id., ¶ 110.  Elhussein applied for a derivative J-2 visa as a dependent spouse.  Id., ¶ 111.  After they appeared for their consular interview in Riyadh on June 4, 2025, the consular officer gave verbal approval, signed and endorsed the DS-2019, and the couple's statuses were updated to "issued."  Id., ¶¶ 112–14.  In reliance on those approvals, Saad resigned from his job, purchased airline tickets, and secured rental housing in Michigan.  Id., ¶ 124.  The couple did not receive their passports until June 22 when the visa foils returned stamped "cancelled without prejudice" and accompanied by a § 1182(f) refusal.  Id., ¶ 115.  Saad submitted a new visa application on June 26 and attended a second consular interview on July 21, at which he submitted materials in support of a national-interest exception.  Id., ¶¶ 116–18.  On August 7, that second application was refused under § 1182(f), with the national-interest exception denied.  See ECF No. 7-1 (Stuart R. Wilson Declaration), ¶ 5.

E.      Procedural Background

Plaintiffs filed this action on November 6, 2025, asserting claims arising from the cancellation and subsequent refusal of their visas.  See Compl., ¶¶ 1–3, 92–131.  They allege that, although their visas were approved and issued before Proclamation 10,949 took effect, State delayed returning their passports and treated the Proclamation as a basis to revoke and refuse the visas under 8 U.S.C. § 1182(f).  Id., ¶¶ 101–08, 112–15, 130.  In addition to challenging those actions in their own cases, Plaintiffs contend that the Government has adopted broader practices governing visa adjudications — a "No-Visa Policy," under which entry restrictions are treated as categorically barring visa issuance, and a "No-NIE Policy," under which national-interest

exceptions are effectively unavailable.  Id., ¶¶ 132–54.  They seek a panoply of types of relief,

including declarations that the policies are unlawful, injunctions setting aside the refusals and

prohibiting future refusals under § 1182(f), and a writ of mandamus compelling issuance of their

visas.  Id. at 43–44.  Defendant now moves to dismiss under Rules 12(b)(1) and 12(b)(6).  See

ECF No. 7 (MTD) at 1.

## II.   Legal Standard

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must

demonstrate that the court indeed has subject-matter jurisdiction to hear his claims.  See Lujan v.

Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231

F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power

to hear the plaintiff's claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative

obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand

Lodge of Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this

reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in

resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  Id.

at 13–14 (quotation marks and citation omitted).  In policing its jurisdictional borders, the court

treats the complaint's factual allegations as true and grants the plaintiff the benefit of all

reasonable inferences.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir.

2005).

Rule 12(b)(6), conversely, provides for the dismissal of an action where a complaint fails

to "state a claim upon which relief can be granted."  In evaluating a motion to dismiss under that

Rule, the court must "treat the complaint's factual allegations as true and must grant plaintiff the

benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air

Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quotation marks and citation omitted).  A

court need not accept as true, however, "a legal conclusion couched as a factual allegation."

Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation omitted).  Although "detailed

factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if]

accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quotation marks omitted).  A plaintiff may survive a Rule 12(b)(6) motion

even if "recovery is very remote and unlikely," but the allegations "must be enough to raise a

right to relief above the speculative level."  Twombly, 550 U.S. at 555.

**III.    Analysis**

In seeking dismissal, the Government first argues that the suit is barred by the doctrine of

consular nonreviewability because, at bottom, Plaintiffs seek to challenge the refusal of their

visas — a discretionary determination committed to consular officers and not subject to judicial

review.  See MTD at 7–10.  As the Court agrees that Plaintiffs' case-specific claims cannot

advance, it need not consider their alternative theories for such claims.  The Court then addresses

the Government's contention that Plaintiffs have not plausibly alleged the existence of the

asserted "No-Visa" or "No-NIE" policies, id. at 10, and that, in any event, the Proclamation and

its implementation fall within the President's broad authority under 8 U.S.C. § 1182(f).  Id. at

13–16.

**A.    Consular Nonreviewability**

**1.    *Overview***

Consular nonreviewability "holds that a consular official's decision to issue or withhold a

visa is not subject to judicial review, at least unless Congress says otherwise."  Saavedra Bruno,

197 F.3d at 1159. "Reflecting the limited role of the judiciary," the doctrine recognizes that decisions on the admission and exclusion of noncitizens "may implicate America's relationship with foreign powers or require evaluating changing political and economic circumstances." Colindres v. U.S. Dep't of State, 71 F.4th 1018, 1021 (D.C. Cir. 2023) (quotation marks omitted). Its reach is broad: review is foreclosed "even where it is alleged that the consular officer failed to follow regulations, the applicant challenges the validity of the regulations on which the decision was based, or the decision is alleged to have been based on a factual or legal error." Baan Rao Thai Rest. v. Pompeo, 2019 WL 3413415, at *2 (D.D.C. July 29, 2019) (citations omitted).

The doctrine has only "two narrow exceptions." Colindres, 71 F.4th at 1021. Under the first, courts have recognized that claims otherwise barred by the consular-nonreviewability doctrine may proceed where "a statute expressly authorizes judicial review." Baan Rao Thai Rest. v. Pompeo, 985 F.3d 1020, 1025 (D.C. Cir. 2021) (cleaned up). Under the second, judicial review remains available "when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." Dep't of State v. Muñoz, 602 U.S. 899, 908 (2024) (quoting Hawaii, 585 U.S. at 703). In that limited circumstance, courts may inquire whether the consular officer gave a "facially legitimate and bona fide reason" for the denial. Id. (quoting Kerry v. Din, 576 U.S. 86, 103–04 (2015) (Kennedy, J., concurring in the judgment)).

Stringent as consular nonreviewability may be, it does not foreclose every challenge that touches on consular decisions. As the Circuit has recognized, "[I]t is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them . . . ." Pietersen v. U.S. Dep't of State, 138 F.4th 552, 560 (D.C. Cir. 2025). That principle derives from International Union of

Bricklayers & Allied Craftsmen v. Meese, 761 F.2d 798 (D.C. Cir. 1985), which established that such review of policy-level challenges is necessary "to assure that the executive departments abide by the legislatively mandated procedures." Id. at 801. The doctrine, in other words, does not bar challenges that target agency policy, just those assailing "a particular determination in a particular case of matters which Congress has left to executive discretion." Id.; see also P.K. v. Tillerson, 302 F. Supp. 3d 1, 12 (D.D.C. 2017) ("[T]he doctrine of consular non-reviewability does not apply because Plaintiffs challenge the State Department's policy, not the discretion of a specific consular officer in applying the policy.").

A policy challenge can proceed even where the named plaintiffs themselves have received final visa refusals if the refusals followed from the policy under attack. Tate v. Pompeo, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) (allowing policy challenge to proceed where plaintiffs "were refused visas specifically because they fell under the relevant Presidential Proclamations, and agency policy required visas to be refused under such circumstances") (citation omitted). The D.C. Circuit recently reaffirmed this principle in Pietersen. The plaintiffs there challenged a visa denial along with a Foreign Affairs Manual instruction governing how consular officers adjudicate such applications. See 138 F.4th at 555–57. The district court dismissed the action under consular nonreviewability, treating the policy challenge as inseparable from the visa decision at issue. Id. at 558. The Circuit, however, reversed. The plaintiffs did not merely "contest[] particular visa determinations by a consular officer"; they also "challenge[d] the lawfulness of the State Department policy." Id. at 560. The Circuit further found it significant that the plaintiffs "sought a declaration that the Manual instruction is unlawful," confirming that their challenge extended beyond any individual denial. Id.

11

Pietersen and related cases thus draw a line: consular nonreviewability bars judicial review of the particular determinations that consular officers render in specific cases.  It does not prohibit forward-looking challenges to the policies and rules that govern those determinations.

### 2.  *Application*

The Government urges that Plaintiffs' suit is barred in its entirety because "[n]o matter how Plaintiffs' challenges are construed, they contravene the principles of the consular nonreviewability doctrine."  MTD at 9.  The Complaint is far from a model of clarity, blending case-specific allegations about Plaintiffs' own visa refusals with broader allegations about the State Department's practices.  Yet, even so, the Government's argument sweeps too broadly. Although several of the counts are challenges to the particular consular determinations that produced Plaintiffs' refusals, which State correctly notes fall within the heartland of consular nonreviewability, others state viable, forward-looking challenges to alleged policy and fall outside the doctrine's reach.

### a.  Case-Specific Challenges

Begin with what the Government gets right.  Counts V through VIII, at their core, seek to turn back the clock and undo the agency actions that resulted in Plaintiffs' visa denials.  Count V, for instance, challenges the Department's "[w]ithholding of [i]ssuance of Plaintiffs' [v]isas" as agency action unlawfully withheld under 5 U.S.C. § 706(2).  See Compl., ¶¶ 198–212. Plaintiffs allege that they "fulfilled all requirements, paid all fees, and are otherwise eligible," yet "Defendant has failed to act pursuant to the adjudication of the visa applications" and "did not act to timely return Plaintiffs' passports with the issued visas."  Id., ¶¶ 204–05.  They accordingly seek to "enjoin[] Defendant from withholding proper issuance of Plaintiffs' visas." Id., ¶ 212.  In substance, that is a request to revisit specific consular determinations — the

cancellation of Plaintiffs' approved visas, the failure to deliver their passports before Proclamation 10,949 took effect, and the subsequent § 1182(f) refusals. Framed as it is, Plaintiffs' theory amounts to a backward-looking challenge to the timing and grounds of those decisions. But "[t]he doctrine of consular nonreviewability prevents a federal court from second-guessing" such determinations. Baan Rao, 985 F.3d at 1023.

Count VI advances a parallel theory under 5 U.S.C. § 706(1), alleging that the Department breached its duty under 8 U.S.C. § 1202(b) and (d) to "review[] and adjudicate[]" Plaintiffs' visa applications. See Compl., ¶¶ 213–25. Plaintiffs' applications have been adjudicated, however. Consular officers conducted interviews, reviewed the applications, and issued refusals under § 1182(f). Id., ¶¶ 105–07, 115. To the extent that Plaintiffs argue that the § 1182(f) refusals are not genuine adjudications because they rest on an allegedly improper basis, that contention again attacks the grounds of particular consular decisions. And "review of completed decisions by consular officers is exactly what the doctrine of consular non-reviewability forbids." Thein v. Trump, 2025 WL 2418402, at *7 (D.D.C. Aug. 21, 2025).

Count VII marches on with a related theory of unreasonable delay under 5 U.S.C. § 555(b). See Compl., ¶¶ 226–36. The theory fits poorly. Section 555(b) mandates that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." Once more, action was taken: consular officers adjudicated Plaintiffs' applications and refused them under § 1182(f). See Compl., ¶¶ 105–07. Al-Shakliah and Saad nevertheless claim that "[t]o the extent Defendant argues that INA 212(f) refusals were adjudications[,] . . . INA 212(f) is not a lawful refusal for a visa application." Id., ¶ 235. That dispute over the basis for the refusals, like the disputes raised in Counts V and VI, asks the Court to peel back the curtain on specific consular decisions and effectively order a do-over of these applications.

13

Count VIII reframes the same case-specific challenge as a request for mandamus under 28 U.S.C. § 1361. Id., ¶¶ 237–55. Plaintiffs ask the Court to compel the Department to "adjudicate visa applications and issue visas" to them. Id., ¶ 242. Mandamus "is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." In re Bluewater Network, 234 F.3d 1305, 1315 (D.C. Cir. 2000). A plaintiff is entitled to this relief only if he shows (1) that he has "a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016). None of those conditions is met. For one, the Government already has acted: it adjudicated Plaintiffs' visa applications and denied them. See Compl., ¶¶ 105–07, 115. To the extent that Plaintiffs seek to compel a new action — an order directing the consular officer to issue their visas — then they once again ask this Court to set aside specific consular determinations as wrongly decided. That request runs squarely into consular nonreviewability, and the case-specific issuance Plaintiffs seek is precisely what the doctrine forecloses.

Al-Shakliah and Saad's contrary arguments do not carry those four counts past the gate of consular nonreviewability. They first contend that the doctrine does not apply because the § 1182(f) refusals were not genuinely discretionary; rather, Department guidance directed that applications subject to the Proclamation must be refused. See ECF No. 9 (Opp.) at 4–5 (citing Patel v. Reno, 134 F.3d 929, 931, 932 n.1 (9th Cir. 1997)). The argument has some force but supports a different kind of claim. That agency policy dictated the outcome may establish Plaintiffs' separate challenge to the directive itself, but the doctrine turns on the character of the claim, not the degree of discretion exercised in a given refusal. The touchstone is whether the suit targets "the State Department's policy" or "the discretion of a specific consular officer in

14

applying the policy." P.K., 302 F. Supp. 3d at 12; see also Bricklayers, 761 F.2d at 801

(distinguishing challenges to "a particular determination in a particular case of matters which

Congress has left to executive discretion" from those ensuring that "the executive departments

abide by the legislatively mandated procedures").  The line thus demarcates reviewable policy

challenges from unreviewable challenges to particular refusals without regard to how much

discretion the consular officer exercised.

Plaintiffs next attempt to invoke the "facially legitimate and bona fide" exception,

arguing that § 1182(f) is not a facially legitimate basis for visa denial.  See Opp. at 4, 8.  The

argument misunderstands that carveout from consular nonreviewability.  The facial-legitimacy

inquiry is not a freestanding path to judicial review of a consular decision; it is the second-step

inquiry that becomes available only after a plaintiff first satisfies the threshold constitutional-

rights exception.  See Muñoz, 602 U.S. at 908 (assuming exception "when the denial of a visa

allegedly burdens the constitutional rights of a U. S. citizen") (quotation marks omitted);

Colindres, 71 F.4th at 1021.  No U.S. citizen has joined this suit asserting a burden on her

constitutional rights.  Without clearing that threshold, there is no facial-legitimacy inquiry to

undertake.

At bottom, Counts V through VIII are retrospective in nature: they ask the Court to undo

what occurred in Plaintiffs' particular cases.  The relief Plaintiffs seek confirms as much: an

order setting aside the refusals, compelling adjudication of the applications, and requiring

issuance of specific visas.  See Compl. at 44.  These counts will accordingly be dismissed as

barred by consular nonreviewability.

                        b.      Policy Challenges

Plaintiffs find firmer ground with their remaining counts — at least in part.  Counts I and

15

II challenge what Plaintiffs call the "No-NIE Policy," consisting of State Department directives to implement the Proclamation's national-interest exception. Counts III and IV challenge the "No-Visa Policy," which Plaintiffs describe as the Department's practice of refusing visas under § 1182(f) for applicants subject to the Proclamation. Each contains both forward-looking policy theories and case-specific challenges and must be parsed accordingly.

Count I alleges that the No-NIE Policy is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). Id., ¶¶ 160–70. The count's strongest theory is a forward-looking challenge to a cable-level directive. As part of that directive, the Department instructed that national-interest exceptions "rarely" be granted and only for "exceptional" national interests, rendering the exception, in Plaintiffs' words, "superficial and unattainable." Id., ¶¶ 166, 168 (quotation marks omitted); see also ECF No. 1-10 (25 STATE 55754). That theory targets an agency directive, embodied in a written cable, applicable across all Proclamation-affected applicants, and operative independently of any individual consular determination. Seeking to declare the practice unlawful, Plaintiffs advance the sort of forward-looking challenge to "the lawfulness of regulations or policies governing consular decisions" that overcomes the hurdle of consular nonreviewability. Pietersen, 138 F.4th at 560.

The same cannot be said of the count's other theory. To the extent that Count I alleges that the Department erred in failing to credit USCIS's prior approval of Al-Shakliah's I-140 NIW petition or the Department's own endorsement of Saad's DS-2019, see Compl., ¶¶ 165, 167, those allegations are not tethered to any agency-wide directive. Plaintiffs identify no policy categorically requiring consular officers to disregard USCIS NIW determinations or DS-2019 endorsements when adjudicating national-interest exceptions. The challenge is, instead, that the Department adjudicated Plaintiffs' national-interest-exemption requests without considering

16

those prior approvals.  Like the case-specific counts dismissed above, this theory asks the Court

to second-guess the Department's evaluation of those national-interest-exception requests.

Count II further blends policy and case-specific challenges.  The policy strand challenges

another feature of State's cable: the directive that "COMs [Chief of Missions]," rather than

consular officers at post, "make NIE requests."  Id., ¶ 174 (alteration in original) (quotation

marks omitted).  Plaintiffs allege that this delegation contravenes 8 U.S.C. § 1202(b), which

requires that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular

officer," and parallel provisions for nonimmigrant applications.  Id., ¶ 175 (citing 8 U.S.C.

§§ 1104(a), 1202(b); 22 C.F.R. §§ 42.62(b), 42.81).  Similar to Count I, this challenge attacks a

categorical instruction embodied in a specific cable and tied to a statutory mandate.  Whether

§ 706(1) is the proper vehicle for that challenge is a question beyond consular nonreviewability

and addressed below.  See infra, Section III.B.

The case-specific strand of Count II fares no better than its counterpart in Count I.  To the

extent that Plaintiffs allege that the Department "unlawfully with[held]" the NIW determinations

made by USCIS and through the DS-2019 endorsement, see Compl., ¶ 172, that theory once

again attacks the Department's evaluation of Plaintiffs' specific national-interest-exception

requests rather than any forward-looking directive.

Counts III and IV challenge the No-Visa Policy, which Plaintiffs trace to a State

Department cable and the Department's accompanying practice of refusing visas under § 1182(f)

for applicants subject to the Proclamation.  See Opp. at 5, 8; Compl., ¶¶ 177–97.  Plaintiffs allege

that "INA § 212(f) is not legal grounds to refuse issuing a visa," Compl., ¶ 178, and that the

State's reliance on that provision to refuse visa adjudications exceeds statutory authority.  Id.,

¶¶ 184–88.  Count III challenges that practice as "in excess of statutory . . . authority" under 5

17

U.S.C. § 706(2)(C), id., ¶ 188; Count IV challenges it as arbitrary and capricious under § 706(2)(A) for, among other things, lacking a reasoned basis for treating entry restrictions as grounds for visa refusal. Id., ¶¶ 192–97.

Both counts target a categorical agency practice rather than any individual consular determination. The challenge is to the Department's directive-driven, across-the-board treatment of § 1182(f) as a basis for visa refusal. In other words, it is a forward-looking challenge to a categorical agency practice that survives consular nonreviewability even if Plaintiffs have themselves received refusals under the challenged policy. See Tate, 513 F. Supp. 3d at 142. That forward-looking character is reinforced by the relief Plaintiffs seek: a declaration that the No-Visa Policy is both unlawful as well as arbitrary and capricious. See Compl. at 44; see also Pietersen, 138 F.4th at 560 (finding reviewable "forward-looking challenges to the lawfulness of regulations or policy governing consular decisions").

The Government resists this conclusion primarily on two grounds. First, it argues that "courts are not required to take a plaintiff's word that [he] is not challenging the visa denial." ECF No. 12 (Reply) at 3 (alteration in original) (quoting Chohan v. U.S. Dep't of State, 2025 WL 2531843, at *2 (D.D.C. Sept. 3, 2025)). The principle is well taken, but it does not apply to the surviving counts here. The Government's lead authority, Kolesnikov v. Blinken, 2024 WL 3638345 (D.D.C. Aug. 2, 2024), illustrates the difference. There, the plaintiffs alleged that the consular officer who denied their B-1/B-2 visa applications failed to "request any supporting documentation" or otherwise engage in adequate factfinding before refusing him. Id. at *2 (quotation marks omitted). They sought an order directing the Department to "exercise actual discretion in processing and adjudicating [their] new [visa] application[s]." Id. at *1 (quotation marks omitted). The court read that request for what it was: a complaint about the manner in

18

which a consular officer adjudicated plaintiffs' particular applications, not a challenge to any agency policy.  Id. at *2.

Counts I through IV here are different in kind.  They challenge written directives that exist independent of any particular plaintiff's adjudication.  The Court, therefore, is not taking Plaintiffs' word that the surviving challenges are forward looking.  The challenges are tethered to identifiable, broadly applicable agency directives, and the relief Plaintiffs seek is prospective.

Second, the Government reads Pietersen to require that a policy challenge be entirely free of case-specific elements to survive.  See MTD at 13.  True, the Pietersen plaintiffs narrowed their appeal to forward-looking claims.  See 138 F.4th at 558.  But the Court of Appeals did not hold that such narrowing was a prerequisite.  On the contrary, the Circuit reversed a dismissal that had treated the policy challenge as inseparable from the case-specific aspects of the complaint, Pietersen v. U.S. Dep't of State, 2024 WL 1239706, at *6 (D.D.C. Mar. 21, 2024), rev'd, 138 F.4th at 562, and applied the policy-challenge principle from Bricklayers to hold that the doctrine posed no bar where the appellants targeted State Department policy rather than particular visa determinations.  Pietersen, 138 F.4th at 560.  The Government's reading would lead the Court down the path the Circuit reversed.  Pietersen instead instructs courts to parse mixed complaints, sustaining the policy strands and dismissing the case-specific ones — not to dismiss them entirely.  Accord Tate, 513 F. Supp. 3d at 142 (allowing policy challenge to proceed where named plaintiffs had received final § 1182(f) refusals).

Counts I and II in part plus the entirety of Counts III and IV thus proceed past consular nonreviewability.  The Court now takes up the policy challenges those claims advance.

B.      No-NIE Policy

Reading the Complaint charitably, Counts I and II can be distilled as challenges to the State Department policy governing implementation of the Proclamation's national-interest exception.  Count I contends that the policy is arbitrary and capricious because State has so narrowed the exception that it is, in Plaintiffs' words, "superficial and unattainable."  Compl., ¶ 168.  Count II claims that the policy unlawfully withholds NIE adjudication under § 706(1) by procedurally relocating decisional authority away from consular officers, contravening § 1202(b)'s mandate that consular officers adjudicate visa applications.  Id., ¶¶ 171–76.

The Government moves to dismiss the No-NIE challenges on three grounds.  First, it argues that Plaintiffs have failed to plead the existence of any policy with adequate specificity.  See MTD at 10.  Second, it asserts that they cannot challenge the Department's national-interest decisions because the Proclamation is not privately enforceable and Plaintiffs have no entitlement to any particular national-interest-exception process.  Id. at 17–19.  Third, State maintains that national-interest exceptions are committed to agency discretion and therefore unreviewable under 5 U.S.C. § 701(a)(2).  Id. at 16–17.  None of these contentions warrants dismissal of Count I, though Count II stands on different footing.

Defendant's threshold pleading argument falters on its own terms.  Notice pleading simply requires "a short and plain statement of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests."  Caribbean Broad. Sys. v. Cable & Wireless PLC, 148 F.3d 1080, 1086 (D.C. Cir. 1998) (quotation marks omitted).  The Government nonetheless laments that Plaintiffs cannot expect Defendant or this Court to "engage in a treasure hunt to find the facts on which Plaintiffs purport to rely."  Reply at 5.  While the point has some purchase given the Complaint's unclear presentation, the Court believes that

20

Plaintiffs have done enough here.  The Complaint identifies the No-NIE Policy by reference to a Department directive instructing that national-interest exceptions be "rarely" granted for "exceptional" national interests and issued by a Chief of Mission.  See 25 STATE 55754, at 1; Compl., ¶ 166.  The structural critique Plaintiffs advance  — that the Department maintains a waiver process in name but has narrowed it to a nullity in practice — is one that was articulated before in the context of an earlier travel-ban waiver program.  Cf. Hawaii, 585 U.S. at 749 (Breyer, J., dissenting) (observing that a Proclamation's waiver program may function as "nothing more than a sham" where waivers are "vanishingly rare") (quotation marks omitted).  The Complaint's identification of the cable as a directive embodying such a policy is enough to give the Government fair notice of what the policy is and the grounds on which Plaintiffs challenge it.

Confronting the claims head on, the Government next argues that Plaintiffs cannot enforce the Proclamation directly, citing the general rule that "there is no private right of action to enforce obligations imposed on executive branch officials by executive orders."  MTD at 17–18 (quoting Hester v. Mayorkas, 2022 WL 4464876, at *3 (D.D.C. Sept. 26, 2022)).  The Proclamation's no-rights disclaimer, Defendant continues, confirms that Plaintiffs "have no right to challenge the State Department's implementation of the national interest exception."  Id. at 18; see also 90 Fed. Reg. at 24,504 ("This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law . . . .").  Defendant separately argues that Plaintiffs "have no constitutional right" to any particular national-interest-exception process.  See MTD at 18 (citing Armah v. U.S. Dep't of State, 2024 WL 2721634, at *10 (D.D.C. May 28, 2024)).

21

Both arguments respond to claims that Plaintiffs do not assert. They do not seek to enforce the Proclamation directly. Instead, they proceed under the APA, which authorizes review of final agency action alleged to be arbitrary, capricious, or otherwise unlawful. See Opp. at 15. The Proclamation's no-rights clause makes clear that it does not itself create rights enforceable against the United States. Yet that disclaimer does not, standing alone, foreclose APA review of agency action implementing the Proclamation. As courts in this district have recognized, a plaintiff may challenge an agency's adherence to its own implementing policies or guidance, even where the underlying directive is a Presidential Proclamation. See Moghaddam v. Pompeo, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) ("Plaintiffs here do not challenge the President's actions and instead challenge agency adherence to the Proclamation itself and agency guidance."); Ashtari v. Pompeo, 496 F. Supp. 3d 462, 469-70 (D.D.C. 2020). To be sure, not every action taken pursuant to a proclamation is reviewable under the APA. See, e.g., Milligan v. Pompeo, 502 F. Supp. 3d 302, 313 (D.D.C. 2020) ("[T]he Circuit has not been perfectly clear on where to draw the line" between reviewable and unreviewable implementation of presidential directives.). But where, as here, Plaintiffs challenge agency policy governing a more-than-ministerial implementation of that directive, the Proclamation's no-rights clause does not by itself preclude review.

Defendant's reliance on Armah is similarly misplaced. There, the court explained that noncitizens lack "a constitutionally protected interest" in either immigrant visas or the procedures by which they are obtained. See 2024 WL 2721634, at *10. The court nevertheless resolved the plaintiff's APA unreasonable-delay claim on the merits under the framework set forth in Telecommunications Research & Action Center v. FCC (TRAC), 750 F.2d 70 (D.C. Cir. 1984), before dismissing a separate procedural-due-process claim for lack of a protected liberty

22

or property interest.  See Armah, 2024 WL 2721634, at *4–10.  Plaintiffs here assert no procedural-due-process claim; they proceed under the APA.  The absence of a constitutional entitlement to a particular national-interest-exception process therefore does not bar review of the challenged policy.

Taking a different tack, the Government last contends that the NIE process is "committed to agency discretion" and thus unreviewable.  See MTD at 17 (quotation marks omitted). Section 701(a)(2) bars review in the "very narrow" set of cases where "statutes are drawn in such broad terms that in a given case there is no law to apply."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (quotation marks omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  The Government argues that this is one such case, since the Proclamation grants the Secretary such wide discretion over whether any "case-by-case . . . individual[]" exception "would serve a United States national interest" that courts cannot review any exercise of that discretion.  See MTD at 17 (quoting Proclamation No. 10,949, 90 Fed. Reg. at 24,503).  But Plaintiffs are not challenging any particular decision about a particular exception.  Instead, they argue that the Proclamation's language contemplates a real exception process — one in which the Secretary considers individual cases and grants exceptions where the national interest is served — and that the Secretary has flouted that directive by making such waivers, in effect, categorically unavailable.  See Compl., ¶¶ 162, 166.  Those contentions — that the Proclamation imposes an obligation and that the Secretary has not met it — are easily susceptible to judicial review.  Cf. Kangarloo v. Pompeo, 480 F. Supp. 3d 134, 140 (D.D.C. 2020) (recognizing that "a policy or practice of failing to grant waivers altogether" presents different question from challenges to particular waiver processes or outcomes).

Having cleared those threshold hurdles, Count I survives.  And taking Plaintiffs' claims as true and "draw[ing] all reasonable inferences from those allegations in the plaintiff[s'] favor," Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015), the Complaint contains factual matter sufficient to state a plausible claim.  Whether the policy in fact contradicts the Proclamation's case-by-case structure, or merely articulates a permissibly restrictive standard within that structure, is a question for summary judgment on a developed record.

Count II, in contrast, stumbles.  Plaintiffs frame that challenge as one for "unlawfully withheld" agency action under 5 U.S.C. § 706(1), alleging that the Department has procedurally relocated national-interest-exception decisional authority away from consular officers in contravention of 8 U.S.C. § 1202(b)'s mandate that consular officers adjudicate visa applications.  See Compl., ¶¶ 171–76.  But § 706(1) does not fit the substance of the claim.  That portion of the APA authorizes courts to compel "discrete agency action that [the agency] is required to take."  Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphasis omitted).  The provision reaches agency inaction, circumstances in which the agency has failed to act on a matter before it.  Here, the agency has acted: the Department promulgated the cable, designated officials have made national-interest determinations, and consular officers have refused Plaintiffs' visas accordingly.  See Compl., ¶¶ 107, 115, 135.  Plaintiffs may disagree with the procedural structure of those actions, but disagreement is not a withholding.  Their contention — that the Department has reassigned decisional authority in alleged contravention of § 1202(b) — is cognizable, if at all, under § 706(2) as arbitrary and capricious, contrary to law, or taken without observance of procedure required by law.  As pleaded, however, Count II cannot proceed under § 706(1).

In sum, Plaintiffs have plausibly alleged that the No-NIE Policy renders the Proclamation's national-interest exception a nullity, but they have not plausibly alleged that the Department is withholding required agency action in the form of national-interest exceptions. The Court will accordingly deny Defendant's Motion as to Count I and grant it as to Count II.

C.    No-Visa Policy

In Counts III and IV, Plaintiffs challenge the State Department's alleged practice of refusing visas under § 1182(f) for applicants subject to Proclamation 10,949 — the No-Visa Policy. Count III alleges that the practice is "in excess of statutory . . . authority" and "not in accordance with law" because § 1182(f) authorizes the President to suspend the entry of aliens but does not authorize the Department to refuse their visas. See Compl., ¶ 188 (quotation marks omitted); see also id., ¶¶ 177–97; 5 U.S.C. § 706(2)(A), (C). Count IV alleges that, even if State had statutory authority to implement § 1182(f) Proclamations through visa refusals, its adoption of the No-Visa Policy was arbitrary and capricious under § 706(2)(A). See Compl., ¶¶ 190–97.

The Government moves to dismiss on two principal grounds. First, it again argues that Plaintiffs have failed to plead the existence of the No-Visa Policy with the specificity Rule 8 requires. See MTD at 10; Reply at 4–5. Second, it maintains that, on the merits, the Department's practice is compelled by § 1201(g) read in conjunction with § 1182(a): because § 1201(g) prohibits issuance of a visa to anyone "ineligible to receive a visa . . . under section 1182," and because § 1182(f) is part of "section 1182," consular officers must refuse visas to applicants subject to a Proclamation issued under that subsection. See MTD at 13–16 (quotation marks omitted); Reply at 5–9.

Once more, State's lack-of-specificity position does not carry the day. The Complaint identifies the policy: the Department's alleged practice of refusing visas under § 1182(f) for

25

applicants subject to entry restrictions under Proclamation 10,949.  See Compl., ¶¶ 146–54.  And it ties that practice to a specific State Department cable that, as a court in this district previously observed, instructs that applicants "subject to the Proclamation . . . must be refused unless [they] qualif[y] for one of the Proclamation's narrowly defined exceptions."  Thein, 2025 WL 2418402, at *3 (cleaned up) (quoting Thein, No. 25-2369, ECF No. 19-7 (State Dep't Cable) at CIV10 (D.D.C. Aug. 14, 2025)); see also Compl., ¶ 188.  That is enough at this stage, as a complaint need only provide "fair notice of what the claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (alterations omitted) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

Defendant's substantive argument revisits well-trodden ground.  This Court previously considered and rejected the same central assertion the Government presses here: that § 1201(g)'s reference to "section 1182" encompasses § 1182(f), such that an entry suspension issued under that subsection simultaneously renders applicants ineligible for visas.  See Milligan, 502 F. Supp. 3d at 314–16.  A person subject to a Presidential Proclamation issued pursuant to § 1182(f), the Court explained, is "merely ineligible to enter," not ineligible to receive a visa.  Id. at 315. Several courts in this district have considered the same issue and have reached the same conclusion.  See Gomez v. Trump, 485 F. Supp. 3d 145, 191–94 (D.D.C. 2020) ("A suspension of entry under § 1182(f) therefore has no bearing on whether the person is . . . ineligible to receive a visa under § 1201(g)."); Rai v. Biden, 567 F. Supp. 3d 180, 194 (D.D.C. 2021) (same), rev'd on other grounds sub nom., Goodluck v. Biden, 104 F.4th 920, 921 (D.C. Cir. 2024); Filazapovich v. Dep't of State, 560 F. Supp. 3d 203, 234–35 (D.D.C. 2021) (same), rev'd on other grounds sub nom., Goodluck, 104 F.4th at 921; Tate, 513 F. Supp. 3d at 144–46 (same); Thein, 2025 WL 2418402, at *15–17 (same).

26

The Court sees no reason to depart from those decisions at this stage. The Government offers none either: it engages with this Court's prior decision and the others that have followed only in its Reply and only in summary fashion. Defendant states that those cases "all rely on the same misreading of Hawaii." Reply at 8. But it supports that assertion with a sole sentence offering a slightly different characterization of Hawaii, not a rebuttal to the chorus of district-court decisions reaching the opposite conclusion. That is hardly the substantive engagement that warrants reconsideration of a line of authority. See Cement Kiln Recycling Coal. v. EPA, 255 F.3d 855, 869 (D.C. Cir. 2001) (quoting Wash. Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 39 (D.C. Cir. 1997)) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'"). Should Defendant wish to offer different or more developed arguments at summary judgment, the Court will entertain them then.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion as to Counts II, V, VI, VII, and VIII, as well as to the case-specific theories in Count I. It will deny the Motion as to Counts III and IV and as to Count I's policy challenge. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 11, 2026

27